**BRYAN T. DAKE**
**JULIE R. PATTEN**
**Assistant U.S. Attorney**
**U.S. Attorney's Office**
**James F. Battin U.S. Courthouse**
**2601 Second Ave. North, Suite 3200**
**Billings, MT 59101**
**Phone:        (406) 657-6101**
**FAX:          (406) 657 6989**
**E-mail:       Bryan.Dake@usdoj.gov**
**                    Julia.Patten@usdoj.gov**

**ATTORNEYS FOR PLAINTIFF**
**UNITED STATES OF AMERICA**


## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## BILLINGS DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | **CR 23-41-BLG-SPW** |
| **Plaintiff,** | |
| **vs.** | |
| **RODERICK PLENTYHAWK,** | **SENTENCING MEMORANDUM** |
| **Defendant.** | |

## INTRODUCTION

Roderick Plentyhawk has pled guilty to possession with intent to distribute methamphetamine for his role in trafficking methamphetamine. To say Plentyhawk was substantially involved in the sale of methamphetamine may be an understatement. Plentyhawk is one of approximately two dozen defendants related to a large-scale conspiracy centered on the distribution of methamphetamine on the Crow and Northern Cheyenne Indian Reservations, known colloquially as "Spear Siding." Plentyhawk was one of the main individuals involved in this conspiracy. While he was not the main source of supply, he was heavily involved with obtaining methamphetamine from Spear Siding and distributing it in the Billings area. The government requests a period of 360 months imprisonment, followed by five years of supervised release.

## OBJECTIONS

### a.  Base offense level calculation:

First, Plentyhawk objects to the base offense level of 38. He asserts a base offense level of 32 (150 grams to 500 grams of actual methamphetamine) reflects a conservative amount of methamphetamine that could be attributed to his conduct. The argument ignores the evidence that he was distribute methamphetamine over several months, supplying several other lower-level dealers.

2

The court may approximate the drug quantity when the amount of drugs seized "does not reflect the scale of the offense." *United States v. Gadson, 763 F.3d 1189, 1220 (9th Cir. 2014)* citing U.S.S.G. §2D1.1 cmt. 5. The method of approximating drug weight must meet three criteria. First, "the government is required to prove the approximate quantity by a preponderance of the evidence…[which means that] [t]he district court must conclude that the defendant is more likely than not actually responsible for a quantity greater than or equal to the quantity for which the defendant is being held responsible." *United States v. Flores*, 725 F.3d 1028, 1038 (9th Cir. 2013) (quoting *United States v. Culps*, 300 F.3d 1069, 1076 (9th Cir. 2006)) (alterations in *Flores*). Second, "the information, which supports an approximation, must possess sufficient indicia of reliability to support its probable accuracy." *Id.* Third, the district court must err on the side of caution in approximating drug quantity. *Id.* Just like the crime of conspiracy, the crime of possession with intent to distribute methamphetamine is a continuing offense, therefore, the Court must calculate the defendant's drug quantity for the period of the entire conspiracy. *United States v. Mancuso,* 718 F.3d 780, 792 (9th Cir. 2013).

Here, the PSR writer has held the defendant accountable for 4.5 kilograms or 9.9 pounds of actual methamphetamine which equates to a base offense level of 38.

3

PSR ¶¶ 17, 23. Based on the facts of the offense, and as outline in the PSR, the
PSR writer's method of approximating the drug weight meets the three criteria
required by *Flores* and the litany of Ninth Circuit cases confirming the approach.

During the course of the investigation, a source, who had purchased from
Plentyhawk on six occasions, reported Plentyhawk was in possession of "large
quantities of methamphetamine." PSR ¶ 10. Plentyhawk was the subject of two
controlled boys – one for 49.2 grams of actual methamphetamine and another for
41.5 grams of actual methamphetamine. During the September controlled buy, the
source reported Plentyhawk had an additional half pound of meth in his backpack.
PSR ¶ 11. In the October controlled buy, Plentyhawk had a much larger bag of
methamphetamine (pictured below) from which he doled out the two ounces. PSR
¶ 12. Agents estimate the bag contained a pound of methamphetamine and an agent
will testify to that, if necessary.

In addition to the methamphetamine seized from Plentyhawk during the
buys, intercepted calls and messages also demonstrate Plentyhawk was selling
significant amounts of methamphetamine. PSR ¶ 13. Of note, several co-
conspirators reported Plentyhawk was indebted to a main source of supply for
somewhere between $20,000 and $30,000 which equates to approximately four to
five pounds of methamphetamine. PSR ¶ 17. A message from Plentyhawk

indicates he had "guns and cars" for his source of supply, again indicating a higher quantity of methamphetamine being traded for a car. *Id.* He was also the source of supply for several other co-conspirators, one of which indicated she purchased one to two ounces of methamphetamine every day from the defendant. *Id.* Indeed, an intercepted message to Plentyhawk indicates that the co-conspirator needed "2" for "12" – meaning two ounces for $1,200. *Id.* Another co-conspirator indicated Plentyhawk went to Spear Siding on 9-10 occasions and purchased pound quantities from Spear Siding. *Id.* Again, all of this would be presented through agent testimony, if needed.

The base offense level calculation reflects that Plentyhawk, possessed several pounds of methamphetamine over the course of the conspiracy. This amount is a conservative estimate, particularly in light of the facts revealed in investigation of this matter. Plentyhawk has no objections to the pertinent facts cited to support the base offense level, and the Court can rely on the evidence presented in the presentence report, but if necessary, the government will call an agent to testify at sentencing to the above-stated facts.

### b. Role in the offense:

Plentyhawk objects to the inclusion of the three-level enhancement for being a manager or supervisor. Plentyhawk objection is premised, in part, on the fact that

he was not the main source of supply, instead that was co-conspirator 1 bringing it from Washington. This missed the point. Plentyhawk ignores the fact that he had *multiple* individuals who were selling methamphetamine for him, to include Hailey James, Carly James, John Littlehead, Nancy Hartsock, and Nicole Schwalbach. His ultimate source of supply may have been from other individuals, as he notes in his objection, but his source is irrelevant to the analysis of whether he was then a manager or supervisor for these other people.

It is the government's burden to prove this enhancement by a preponderance of the evidence, but "the district court may, without error, rely on evidence presented in the PSR to find by a preponderance of the evidence that the facts underlying a sentence enhancement have been established." *United States v. Maldonado*, 215 F.3d 1046, 1051 (9th Cir. 2000). Plentyhawk has no objections to the pertinent facts for this enhancement, but if necessary, the government will call an agent to testify at sentencing to the above-stated facts detailing Plentyhawk's role.

Pursuant to USSG §3B1.1, the applicable provision is "(b) If the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by 3 levels." The term "participant" is defined to mean someone "who is criminally

responsible for the commission of the offense," which does not include undercover officers or informants. USSG § 3B1.1, cmt. n.1. Commentary Note 4 provides a variety of factors to consider when distinguishing between the leader/organizer versus manager/supervisor:

> … exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others. There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy. This adjustment does not apply to a defendant who merely suggests committing the offense.

Plentyhawk' s conduct as a manager/supervisor fits these factors. Plentyhawk certainly had a larger share of the fruits of the crime, even though he was indebted to a main source of supply between $20,000 and $30,000. PSR ¶ 17. Co-conspirators obtained meth from Plentyhawk for the purpose of distribution. PSR ¶ 17. A co-conspirator bought one to two ounces of meth from Plentyhawk every day. PSR ¶ 17.

When an individual could not get ahold of Plentyhawk, they were able to contact Plentyhawk's girlfriend to set up the deal *from* Plentyhawk. PSR ¶ 12. Plentyhawk's own messages with co-conspirators provides evidence of his direction over others. On December 14, 2022, Plentyhawk messaged one of his co-

conspirators and informed her "I'm at my mom's you can come see me or send your man I got a little work. I'm going to [Lodge Grass] this evening." PSR ¶ 13. One of the co-conspirators Plentyhawk supervised told Plentyhawk "Wattup bro he might need 2 of does things but they only got 12 but I will make sure first." PSR ¶ 13. This is indicative of the fact that Plentyhawk was directing this co-conspirator's sale because the co-conspirator wanted to run the price by Plentyhawk.

At minimum, Plentyhawk's role in this offense justifies application of the two-level enhancement under 3B1.1(c). In addition to the facts considered above, the two-level enhancement will apply if "a defendant supervises other participants, he need exercise authority over only one of the other participants to merit the adjustment." *United States v. Cooper*, 173 F.3d 1192, 1207 (9th Cir. 1999). Importantly, "[a] single incident of persons acting under a defendant's direction is sufficient evidence to support a two-level role enhancement." *United States v. Maldonado*, 215 F.3d 1046, 1050 (9th Cir. 2000). Clearly, Plentyhawk exercised authority over one of the other participants as identified and described above. If the two-level enhancement applies, this results in a total offense level of 39 and a resulting guideline range of 360 months to life.

## ARGUMENT

The Court shall impose a sentence "sufficient, but not greater than necessary." 18 U.S.C. § 3553(a) (2018). Determining a "sufficient, but not greater than necessary" sentence requires the Court to consider the following factors:

- seriousness of the offense;

- respect for the law;

- just punishment for the offense;

- adequate deterrence in relation to the criminal conduct;

- protecting the public from further crimes of the defendant; and,

- providing the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

Additional considerations for the Court when imposing an appropriate sentence include: the nature and circumstances of the offense, the history and characteristics of the defendant, and the kinds of sentences available. *Id.* § 3553(a)(1), (3). The Court should similarly consider the sentencing guidelines and policy statements, as well as "the need to avoid unwarranted sentencing disparities." *Id.* § 3553(a)(4), (5), (6). Finally, the Court should consider "the need to provide restitution to any victims of the offense." *Id.* § 3553(a)(7).

The government recommends a sentence of 360 months imprisonment, five years of supervised release, and a $100 special assessment.

This is Roderick Plentyhawk – dipping into a bag of meth that he got from Spear Siding:



Plentyhawk was a prolific dealer of methamphetamine, involved in a multi-state drug trafficking organization centered on two properties on the Crow Indian Reservation, including one referred to as Spear Siding. PSR ¶¶ 7-8. For each defendant, the government intends to provide the Court with a clear understanding of the specific defendant's involvement in the offense and how their conduct

impacted the entirety of the conspiracy. Plentyhawk is appropriately considered in the top portion of this conspiracy. He was directly involved with the most major players, including those bringing the drugs from Washington to Spear Siding. He sold methamphetamine throughout Billings and across two of the Indian reservations. Plentyhawk was one of the primary sources of methamphetamine on Northern Cheyenne and sourced other dealers/co-conspirators. PSR ¶ 9. Plentyhawk is responsible for the distribution of almost ten pounds of methamphetamine. While the ultimate source of supply from Washington is certainly more culpable, Plentyhawk ranks up towards the top of people involved in this conspiracy.

As an initial matter, the distribution of methamphetamine is crippling communities, including the Indian reservations. It is an offense against society as a whole and the mere existence of methamphetamine is detrimental. Indian country is disproportionately impacted by the devastation of methamphetamine, targeted by drug traffickers wanting to exploit these people struggling with severe addiction and abject poverty. This Court is unfortunately familiar with the lasting impacts of methamphetamine, including the addiction-related issues plaguing users and the number of violent offenses rooted in methamphetamine use. To say it is victimless does not properly account for the collateral victims impacted: "Methamphetamine

11

… is destroying lives, breaking up families, and undermining tribal cultures."
Christopher B. Chaney, *Overcoming Legal Hurdles in the War Against Meth in Indian Country,* 82 N.D.L. Rev. 1151 (2006). It ruins the lives of users and everyone around the user (including spouses, parents, siblings, and children). Plentyhawk's conduct in this case was no exception. He distributed meth and thereby facilitated the destruction that meth produces in the tribal community, as well as in Billings.

The seriousness of the defendant's conduct in this case is clear from his involvement in the multiple controlled purchases of methamphetamine, and from his relationships with all of the most culpable individuals in this conspiracy. Plentyhawk was sourced from Spear Siding, carried guns around with him in his backpack, and sourced both other dealers and users. PSR ¶ 9. Plentyhawk was purchasing from a group who was moving methamphetamine from Washington and then then moving proceeds from meth through the state of Washington and eventually Mexico. PSR ¶ 8.

Distributing methamphetamine on its own is serious conduct deserving of serious punishment, but the addition of the use of a firearm makes it even more egregious. In September 2022, Plentyhawk sold multiple quantities of drugs to a confidential source. PSR ¶¶ 10-11. He had a pistol in front pants pocket and the

handle was visible. PSR ¶ 11. Plentyhawk messaged a co-conspirator to tell her that "I got some money and I got some guns and cars for him [meaning his source]." PSR ¶ 13. When Plentyhawk was arrested, following a high-speed chase with law enforcement, he was found with a stolen 9mm Taurus in his pants (loaded with 23 rounds of ammunition and one in the chamber), as well as 24 loose rounds of ammunition from his pockets. PSR ¶¶ 15-16. More rounds and magazines were found inside his car. PSR ¶ 15.

Plentyhawk's guideline range is accurately calculated and a sentence within this range is sufficient but not greater than necessary. He is held accountable for almost ten pounds of methamphetamine, perhaps a conservative number, receives an enhancement for his use of a firearm during a controlled buy, and receives a manager/supervisor enhancement, resulting in a total offense level of 40. This accurately accounts for his conduct in this case.

Plentyhawk's criminal history further drives the guideline range as he is a criminal history category of four with nine criminal history points. PSR ¶ 42. Plentyhawk has criminal mischief and obstruction charges, both resulting in one point, from 2012 and 2013. PSR ¶¶ 36-37. In 2017, Plentyhawk's criminal conduct then escalates with an armed robbery where he and co-conspirators entered a house by shooting the main door and then demanding the victim's bags of money and

guns. PSR ¶ 38. The group tied up the victim with a phone cord. *Id.* Plentyhawk was paroled for this offense and is not set to discharge the sentence until 2025. *Id.* Next, Plenythawk was convicted of criminal mischief in 2021 after he attempted to take a purse from a 64-year-old woman and dragged her across the ground. PSR ¶ 39. Again, Plentyhawk is on probation for this offense and is not set to discharge it until 2027. PSR ¶ 39. His criminal history is serious and appears to be escalating over time.

A sentence should afford Plentyhawk an opportunity for both mental health and substance abuse treatment. He has never participated in mental health treatment but appears to need assistance with criminal thinking behavior. He has been battling addiction since a young age and substance abuse treatment is necessary.

The Court should avoid unwarranted sentencing disparities in determining an appropriate sentence. As noted above, Plentyhawk is a higher-level individual as a part of this conspiracy. For the Court's reference, the table below includes all of the individuals affiliated with this investigation and the sentences they received. Each of these falls below Plentyhawk in terms of guideline range and overall involvement in the conspiracy:

| Defendant | Case Number | CHC | Guideline Range | Sentence |
|---|---|---|---|---|
| Keilee Diaz | CR 23-41-BLG-SPW | I | 24 to 30 months | 12 months + 1 day |
| Nancy Hartsock | CR 23-69-BLG-SPW | V | 100 to 125 months | 72 months |
| Carly James | CR 23-41-BLG-SPW | III | 135 to 168 months | 84 months |
| Renita Redfield | CR 23-41-BLG-SPW | III | 70 to 87 months | 63 months |
| Darlon Lefthand | CR 23-41-BLG-SPW | III | 120 to 135 months | 84 months |

A sentence imposed by the Court should also provide adequate deterrence. Plentyhawk's conduct is very serious, and a sentence of incarceration serves to deter him and the general public from engaging in this conduct. While general deterrence is not always present in drug offenses, it is certainly present here as individuals who engage in the sale of drugs on reservations, such as the Crow Indian Reservation and Northern Cheyenne Indian Reservation, should understand that such dealing will eventually lead to federal prison and years of supervised release.

The government believes a sentence of 360 months incarceration and five years of supervised release adequately addresses all sentencing considerations and is sufficient, but not greater than necessary.

DATED this 2nd day of January, 2024.

JESSE A. LASLOVICH
United States Attorney

*/s/ Bryan T. Dake*
BRYAN T. DAKE

Assistant U.S. Attorney

*/s/ Julie R. Patten*
JULIE R. PATTEN
Assistant U.S. Attorney